UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

                                        Plaintiff,

     v.

ANDREW DEFRANCESCO, MARLIO
MAURICIO DIAZ CARDONA, CARLOS
FELIPE REZK, NIKOLA FAUKOVIC, and
CATHERINE DEFRANCESCO,

                                        Defendants.

---

23 Civ. 00131 (JSR)

ECF CASE

---

PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
OPPOSITION TO DEFENDANT ANDREW DEFRANCESCO'S MOTION TO
DISMISS COUNTS ONE AND TWO OF THE COMPLAINT

SECURITIES AND EXCHANGE COMMISSION
David P. Stoelting
Jason D. Schall
Katherine S. Bromberg
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004-2616
(212) 336-0174 (Stoelting)

April 19, 2023

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ...................................................................................................1

THE COMPLAINT'S RELEVANT FACTUAL ALLEGATIONS.........................................2

   I.    Overview of Allegations ...............................................................................................2

   II.   Apple Halted Cool's Ability to Expand Because of Cool's Vast Performance Failures and Financial Difficulties .................................................................................................3

   III.  Cool's Misleading SEC Filings Regarding Its Relationship with Apple............................5

   IV.  DeFrancesco's Pump-and-Dump Scheme ........................................................................6

LEGAL STANDARD ................................................................................................................9

ARGUMENT .........................................................................................................................10

   I.    The Complaint Adequately Alleges Material Misstatements and Omissions ..................10

       A.  The Misrepresentations and Omissions Were Not Puffery...................................11

       B.  The Misrepresentations and Omissions are Actionable, Even if They Are Opinions........................................................................................................12

   II.   Cool's Risk Disclosures Fraudulently Described Harms That Had Already Occurred as Mere Possibilities...................................................................................................17

   III.  The SEC Does Not Contend That DeFrancesco "Made" the Article Statements.............21

   IV.  The Complaint Adequately Alleges Claims for "Scheme Liability".................................21

CONCLUSION .......................................................................................................................25

## <u>**TABLE OF AUTHORITIES**</u>

<u>**Cases**</u>

*Abramson v. Newlink Genetics Corp.*, 965 F.3d 165 (2d Cir. 2020) .......................................12, 13

*Altimeo Asset Mgt. v. Qihoo 360 Tech. Co. Ltd.*, 19 F.4th 145 (2d Cir. 2021)............................15

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................................9

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................................9

*Chapman v. Mueller Water Prod., Inc.*, 466 F. Supp. 3d 382 (S.D.N.Y. 2020)...........................20

*Chechele v. Laubies*, 527 F. Supp. 3d 526 (S.D.N.Y. 2021) ........................................................9

*Christine Asia Co. v. Ma*, 718 F. App'x 20 (2d Cir. 2017).....................................................18, 20

*Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624 (S.D.N.Y. 2012) ......................18

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297 (2d Cir. 2015) ......9

*Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171 (S.D.N.Y. 2010) ...............................11

*Ganino v. Citizens Utils. Co.*, 228 F.3d 154 (2d Cir. 2000) ...................................................15, 20

*International Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46 (2d Cir. 2022) ............................9

*Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245 (2d Cir. 2014) ...........................17, 18, 20

*In re Morgan Stanley Info. Fund Sec. Litig.,* 592 F.3d 347 (2d Cir. 2010) ..................................18

*Novak v. Kasaks*, 216 F. 3d 300 (2d. Cir. 2000) .........................................................................12

*Omnicare, Inc. v. Laborer Dist. Council Constr. Ind. Pension Fund,* 575 U.S. 175 (2015)...12, 13

*Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.,*
     753 F. Supp. 2d 166 (S.D.N.Y. 2010).................................................................................18

*In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 930 F. Supp. 68 (S.D.N.Y. 1996).................18

*SEC v. Frohling*, 851 F.3d 132 (2d Cir. 2016) ...........................................................................10

*SEC v. Johnson*, No. 03-cv-177 (JFK), 2006 WL 2053379 (S.D.N.Y. July 24, 2006) .................10

*SEC v. ITT Educ. Servs., Inc.*, 303 F. Supp. 3d 746 (S.D. Ind. 2018) .........................................24

*SEC v. Nutra Pharma Corp.*, 450 F. Supp. 3d 278 (E.D.N.Y. 2020) ................................................25

*SEC v. Rio Tinto*, 41 F.4th 47 (2d. Cir. 2022)..............................................................21, 22

*SEC v. Rosenberger*, No. 22-cv-4736 (DLC), 2023 WL 1928093 (S.D.N.Y. Feb. 10, 2023) ........9

*SEC v. Sandoval*, No. 17-cv-20301, 2018 WL 11353292 (S.D. Fla. Apr. 11, 2018) ..................23

*SEC v. Sayid*, No. 17-cv-2630 (JFK), 2018 WL 357320 (S.D.N.Y. Jan. 10, 2018).....................22

*SEC v. Sequential Brands Grp., Inc.*,
    No. 20-cv-10471-JPO, 2021 WL 4482215 (S.D.N.Y. Sept. 30, 2021) ...................................14

*SEC v. StratoComm Corp.*, 652 Fed. App'x 35 (2d Cir. 2016) .....................................................14

*SEC v. Stubos*, No. 22-cv-04674 (LJL), 2022 WL 6776741 (S.D.N.Y. Oct. 11, 2022)..........22, 23

*SEC v. Sugarman*, No. 19-cv-5998, 2020 WL 5819848 (S.D.N.Y. Sept. 30, 2020)....................22

*SEC v. Thompson*, 238 F. Supp. 3d 575 (S.D.N.Y. 2017) ..........................................................12

*Steinberg v. PRT Grp.*, 88 F. Supp. 2d 294 (S.D.N.Y. 2000) ......................................................17

*Tongue v. Sanofi,* 816 F.3d 199 (2d Cir. 2016)...........................................................................15

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
    No. 20-cv-08585 (LJL), 2022 WL 4085677 (S.D.N.Y. Sept. 2, 2022) ...................................22

*Ulbricht v. Ternium S.A.*,
    No. 18-cv-6801 (PKC), 2020 WL 5517313 (E.D.N.Y. Sept. 14, 2020)..................................20

*In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388 (S.D.N.Y. 2005)..........19, 20

*Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991).....................................................16

*In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528 (S.D.N.Y. 2016).......................11

*West Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
    845 F.3d 384 (8th Cir. 2016)...........................................................................................23

*Williams v. Globus Med., Inc.*, 869 F.3d 235 (3d Cir. 2017)........................................................20

## **Rules**

Fed. R. Civ. P. 9(b) ...................................................................................................................10

**<u>Secondary Sources</u>**

W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Torts § 109.....................13

Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this opposition to the Motion to Dismiss Counts One and Two of the Complaint ("Motion") filed by Defendant Andrew DeFrancesco ("DeFrancesco").

## PRELIMINARY STATEMENT

The Complaint alleges that DeFrancesco engaged in a classic pump-and-dump scheme. DeFrancesco was a Director and the Chairman of the Board of Cool Holdings, Inc. ("Cool"), a publicly-traded company. Cool owned a small number of retail stores (no more than 16), mostly in Latin America, selling products manufactured or authorized by Apple, Inc. ("Apple"). Cool had vast operational and financial failures, which led to Apple halting Cool's ability to expand stores in January 2018. Yet Cool's later SEC filings touted its "strong partnership with Apple" and its goal and expectation of expanding to 200 stores within three years, while giving a misleading warning that its growth was "highly dependent" upon its relationship with Apple and that any failure to adhere to Apple's performance standards "could jeopardize our strategy." The filings concealed that Cool had already failed to adhere to Apple's performance standards and thus could not expand.

Meanwhile, DeFrancesco engaged in his pump-and-dump scheme. He accumulated up to 32% of Cool's outstanding stock through nominee entities owned by his family members. He never disclosed his accumulation of Cool stock, as was legally required. He paid for and arranged a deceptive promotional campaign that combined the fictional 200-store figure with other fictional data to make the wild assertion that Apple was providing Cool a "$900 Million Opportunity." The promotion falsely claimed that it was paid for by Cool itself, rather than by DeFrancesco. When the promotion began, Cool's stock price skyrocketed, and DeFrancesco unloaded his shares for millions of dollars in profit.

DeFrancesco's Motion argues that these allegations do not adequately plead a securities fraud claim. *First*, he claims that the assertion of a goal and expectation of expanding to 200 stores in three years was "corporate puffery or sincere, reasonable opinions." But false statements are not "puffery," and the fact that Cool was not permitted to expand at all, combined with DeFrancesco's rapid sale of Cool stock, demonstrate that the purported goal and expectation of expanding over ten-fold in three years was neither sincerely nor reasonably held. To the extent DeFrancesco contends it was, that is a factual issue inappropriate for a motion to dismiss. *Second*, DeFrancesco contends that Cool's warnings about potential restrictions from Apple were not deceptive, even though the restrictions were already in place. Second Circuit law establishes, however, that issuers cannot describe a risk as hypothetical when that risk has already come to pass. *Third*, DeFrancesco denies that he was the "maker" of the misrepresentations and omissions in the fraudulent promotional campaign, but the SEC does not contend that he was. *Fourth*, DeFrancesco contends that the SEC failed to allege a deceptive act, beyond his misrepresentations or omissions, as required for scheme liability. However, courts in this District have held that participation in a pump-and-dump scheme satisfies this requirement. The Court should deny DeFrancesco's Motion.

**THE COMPLAINT'S RELEVANT FACTUAL ALLEGATIONS**[1]

**I.    Overview of Allegations**

The Complaint alleges that DeFrancesco—a Director and the Chairman of the Board of Cool—orchestrated a fraudulent pump-and-dump scheme involving Cool's NASDAQ-traded stock. DeFrancesco's scheme involved false and misleading statements and omissions in Cool's

---

[1] References to "(¶__)" are to paragraphs of the Complaint (DE 1). References to "(Def. Br. at __)" are to DeFrancesco's memorandum in support of his Motion (DE 55). References to "(Def. Ex. __)" are to exhibits to the Declaration of Jeremy Butt supporting the Motion (DE 56).

2

SEC filings (including a registration statement) about its prospects and relationship with its chief supplier, Apple; and in a Cool promotional campaign that DeFrancesco secretly funded, which included false claims about the company's past success and future prospects with Apple. (¶¶ 1, 2, 3, 102, 151-58.) DeFrancesco, along with Cool executives and Defendants Marlio Mauricio Diaz Cardona ("Diaz") and Felipe Rezk ("Rezk"), signed the false SEC filings. (¶ 3.) DeFrancesco—with the help of Diaz, Rezk, and DeFrancesco's executive assistant, Defendant Nikola Faukovic—assisted DeFrancesco with the fraudulent promotional campaign by arranging for the publication of a series of fraudulent articles. (¶ 4.) As part of the scheme, DeFrancesco—aided by Faukovic and DeFrancesco's ex-wife, Defendant Catherine DeFrancesco—concealed from the public his substantial ownership (32%) of Cool's outstanding shares by stashing them in nominee entities that DeFrancesco secretly controlled (the "Nominee Entities"). (¶¶ 2, 5, 7.) During the first four days of his fraudulent Cool promotional campaign—with its stock price quadrupling—DeFrancesco sold more than 500,000 Cool shares through the Nominee Entities' brokerage accounts for proceeds of nearly $3.5 million. (¶ 5.)

## II.   Apple Halted Cool's Ability to Expand Because of Cool's Vast Performance Failures and Financial Difficulties.

Cool was created in March 2018 by the reverse merger of a private company, Cooltech, Inc., with InfoSonics, Inc., a company that was publicly traded on NASDAQ (references to Cool below include Cooltech, Inc.). (¶ 27.) Cool operated a small chain of retail electronics stores, called OneClick stores, which featured Apple's products. (¶¶ 3, 28.) Cool's prospects depended on its relationship with Apple and its related ability to expand its stores, particularly in Latin America, Cool's largest market. (¶¶ 3, 71.) However, by the fall of 2017, Cool's relationship with Apple was deteriorating and Apple repeatedly sought payment for overdue invoices. (¶ 57.) On January 17, 2018, Cool's relationship with Apple had become so fractured that Apple halted

Cool's Latin America expansion, subject to Cool's correcting its performance and credit problems. (¶ 58.)

DeFrancesco was well aware of Apple's displeasure with Cool and the threats this presented to Cool's business. For instance, on May 4, 2018, an Apple Collections manager told DeFrancesco, Rezk, and Diaz, "If we don't receive payment today we will be forced to put One Click's account on hold." (¶ 65.) In response, DeFrancesco told Rezk, "[Apple is] telling us to [F*ck] off." (¶ 66.) On June 7, 2018, DeFrancesco contacted the Apple director in charge of Cool's Latin America sales to set forth Cool's supposed progress. (¶ 72.) But the Apple director responded on June 13 by identifying several areas of concern and informed DeFrancesco that Cool was "far from reaching proposed 'Business Plan' metrics." (¶¶ 73-75.) The next day, June 14, 2018, Apple sent Cool an email noting that payment of almost half a million dollars was past due and that Cool's "overall credit standing with Apple has already been affected and will continue to deteriorate." (¶ 77.) On July 16, 2018, in a phone call, DeFrancesco asked the Apple director and other Apple personnel to lift Apple's halt on Cool's expansion, but Apple refused. (¶¶ 84-86.)

In August 2018, Apple continued to identify problems with Cool's operations and refused to allow it to expand. In late August 2018, Apple emailed Diaz and Rezk, re-emphasizing the issues it was having with Cool's poor performance and the unmet conditions for Apple to re-authorize its expansion and setting specific terms for lifting the January 2018 halt:

> My message to you is as follows.  We have to ensure that all stores have consistent inventory, that invoices are paid on time, that the experience is consistently good, and that the stores in the program consistently comply with the program's guidelines.  **For us to re-authorize an expansion with One-Click we need this to start happening in a consistent way for a reasonable time and in all stores that already operate in Latin America**.

(¶ 95 (emphasis added).) On September 27, 2018, Apple informed Cool by email that "Apple

will not approve Reseller's requests for further expansion of its Authorized Locations [in Latin America] in view of the poor business metrics of the existing One Click stores evidenced during the last 24 months." (¶ 166.)

### III.   Cool's Misleading SEC Filings Regarding Its Relationship with Apple

From March through September 2018, despite its ongoing critical problems with Apple, Cool made several materially false and misleading statements and omissions in its SEC filings regarding its past success and future prospects. (¶ 96.)

Notwithstanding Apple's harsh rebukes, Cool issued a press release on June 14, 2018, filed with the SEC as an attachment to a Form 8-K (Bromberg Decl. Exhibit 1), announcing its name change and including a quotation from DeFrancesco claiming the company had a "strong partnership with Apple®." (¶ 79.) The press release also quoted DeFrancesco as saying that Cool "will . . . become the largest authorized reseller of Apple® products and services in the Americas." (¶ 80.) DeFrancesco made these false statements in the June 14, 2018 press release despite knowing that Apple had halted Cool's expansion and that the relationship was not "strong." (¶¶ 73-77.)

On June 15, 2018, DeFrancesco signed a Cool registration statement filed with the SEC; he also signed Cool's amendments thereto, filed on August 28 and September 10, 2018 (collectively, the "Registration Statements."). (¶ 98.) The Registration Statements incorporated by reference Cool's SEC Form 10-Q reports for the quarters ended March 31 and June 30, 2018 (filed May 21 and August 14, respectively), each of which stated:

> a.   Our goal in the next three (3) years is to expand our network of OneClick stores to 200 locations in Latin America, the U.S. and Canada to become one of Apple's largest retail partners.  We expect that our growth will come from a combination of organic expansion on a store-by-store basis, as well as external acquisitions.

    b.  [T]he growth of our business is highly dependent upon our relationship with Apple in providing us with the licenses and approvals necessary to expand our footprint into various countries and regions around the world.  **Apple has very strict performance standards and guidelines that we must achieve and adhere to in order to be successful and continue to receive their support.  Consequently, any deterioration of our performance or failure to adhere to their guidelines could jeopardize our strategy and adversely affect our financial performance.**

    c.  Our sales and profitability depend in part upon opening new stores [selling Apple products] and operating them profitably . . . .  **If we fail to manage new store openings in a timely and cost-efficient manner, our growth or profits may decrease.**

(¶¶ 97-98 (emphasis added).) These statements did not include that: (1) Apple already had halted Cool's Latin American expansion by January 2018, and this halt remained in effect; (2) Cool already had repeatedly failed to adhere to Apple's performance standards and guidelines; (3) Cool did not have a license from Apple to operate in Canada and had no concrete U.S. expansion plans; (4) and Cool was perpetually underfunded and in dire financing straits. (¶ 99.)

When DeFrancesco signed the Registration Statements, he knew that: Cool already had failed to meet Apple's performance standards and guidelines; Apple had therefore halted Cool's expansion in January 2018 and had not reversed that decision; and Cool's purported goal of expanding to 200 stores was unattainable and had no basis in reality. (¶¶ 64-95, 101.) Indeed, Cool did **not** expand its Apple stores after the January 2018 expansion halt; the seven stores that Cool added in August 2018 resulted from a transaction negotiated in connection with the merger with Infosonics. (¶ 89; Def. Ex. 4 at 19.)

## IV.  DeFrancesco's Pump-and-Dump Scheme

DeFrancesco's scheme had three phases: the accumulation of shares; the promotion of the stock (the "pump"); and the stock sale in the wake of the successful promotion (the "dump").

***The stock accumulation***. DeFrancesco acquired a significant percentage of Cool shares, which he failed to disclose—in violation of regulatory requirements. (¶¶ 6, 7.) DeFrancesco acquired his shares through the Nominee Entities, which he controlled, but deceptively had placed in the names of his ex-wife, Catherine DeFrancesco, and other family members. (¶¶ 5-7, 30-42, 44, 53, 56, 62, 103-13, 117-19, 121-24.) To conceal his control of these shares, he lied to Cool's auditors and signed a confirmation falsely representing that he had no involvement in the management and directorship of, or influence over, these entities. (¶¶ 114-19, 191-96.) DeFrancesco used several measures to accumulate Cool shares in these Nominee Entities from May through September 2018, including a debt conversion (¶¶ 116-17, 119), the purchase of another investor's Cool notes (¶ 118), and the exercise of options (¶ 121). By September 2018, DeFrancesco thus beneficially owned more than 32% of Cool's outstanding shares, which he failed to disclose publicly, despite his legal obligation to do so pursuant to Sections 13(d) and 16(a) of the Securities Exchange Act of 1934 ("Exchange Act"). (¶¶ 125-26, 214-24.)

***The fraudulent promotion***. From June through September 2018, DeFrancesco funded and participated in a fraudulent Cool promotional campaign. (¶¶ 127-62.) DeFrancesco hired the promoter and directed a subordinate to coordinate with Rezk and Diaz on the campaign. (¶ 128.) DeFrancesco then received false statements that Rezk had sent to the promoter. (¶¶ 130-31.) These false statements included that "Apple has trusted OneClick with it's [sic] growth strategy and we are one the few companies that is expanding aggressively in these three markets," (¶ 130), when, in fact, the company was not expanding because Apple did not trust it, and that OneClick stores had an average annual revenue per square foot of $3,750 (¶ 131), when, in fact, Cool's internal estimates put the figure at less than half that amount, $1,348. (¶¶ 133-34.)

DeFrancesco received the promotional articles before they were published on September

16, 17 and 19, 2018, and they included statements that DeFrancesco knew or recklessly disregarded were materially false and misleading. (¶¶ 147, 149-50, 172.) For example, the promotional articles asserted: "Cool Holdings . . . and its all-Apple stores already earn an impressive $3,750 in revenue per single square foot. That's more than Tiffany & Co., more than Michael Kors-and way more than Costco." (¶¶ 131-34, 150, 153.) This statement was false because, as described above, Cool's internal revenue estimates put the revenue figure at less than half that amount. (¶¶ 131-35.) Two articles further included the false headlines: "Small NASDAQ Company Just Got a Huge $900 Million Opportunity from Apple" and "Why is Apple Giving This Tiny Stock a $900 Million Opportunity." (¶ 151.) This $900 million figure was also fictitious. It was derived by combining several false or misleading data points that Rezk had provided, including the false $3,750 per square foot revenue number, a baseless projection of growth to 200 stores, and a false size figure of 1,200 square feet per store on average, when the true average was 1,022 square feet. (¶¶ 134, 152.) The articles contained other falsehoods, too, including that Apple was giving Cool "a taste of its hugely profitable real estate segment." (¶¶ 154-57.) Finally, the articles included a false disclaimer stating that they were paid for by Cool when, in fact, DeFrancesco had paid for them through two Nominee Entities. (¶¶ 158-62.)

On September 19, 2018, Apple's Director for Latin America spoke with Rezk and followed up by email attaching a link to one of the promotional articles. (¶ 163.) The Apple director demanded "written confirmation from Cool Holdings that Cool Holdings and its affiliates will . . . not do anything like this paid advertising again." (*Id.*)

*The stock sales*. From September 17 through 20, 2018, immediately after the start of his fraudulent promotional campaign, DeFrancesco sold more than 500,000 Cool shares through the Nominee Entities' brokerage accounts for total proceeds of nearly $3.5 million. (¶¶ 5, 170.)

DeFrancesco also arranged for the unregistered (undisclosed) sales of over one million shares of the Nominee Entities' Cool stock, which included restricted shares acquired from Cool in unregistered transactions. (¶¶ 171-72, 205-06.)

## LEGAL STANDARD

To withstand a motion to dismiss under Rule 12(b)(6), the Complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A court must "accept[ ] all well-pleaded allegations in the complaint as true, drawing all reasonable inferences in the plaintiff's favor," and "[f]act-specific questions cannot be resolved on the pleadings.'" *International Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 53 (2d Cir. 2022). Dismissal is not warranted unless the plaintiff cannot provide a basis for its claims through factual allegations sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

To meet Rule 8(a)'s liberal pleading standard, a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 677-78. To satisfy Rule 9(b)'s heightened standard for pleading fraud, a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *SEC v. Rosenberger*, No. 22-cv-4736 (DLC), 2023 WL 1928093, at *3 (S.D.N.Y. Feb. 10, 2023) (quoting *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015)); *see also Chechele v. Laubies*, 527 F. Supp. 3d 526, 536 (S.D.N.Y. 2021) ("Rule 9(b)

requires that claims sounding in fraud recite the 'who, what, when, where, and how.'") (citation omitted). "Malice, intent, knowledge, and other conditions of a person's mind," however, "may be alleged generally." Fed. R. Civ. P. 9(b).

## ARGUMENT

DeFrancesco moves to dismiss the Complaint's allegations that he violated Exchange Act Section 10(b) and Rule 10b-5 thereunder and Section 17(a) of the Securities Act of 1933 ("Securities Act"). "Section 10(b) of the Exchange Act and Rule 10b-5, which prohibit fraud in the purchase or sale of a security, are violated if a person has (1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *SEC v. Frohling*, 851 F.3d 132, 136 (2d Cir. 2016) (internal quotation marks omitted). "The elements of a claim under § 17(a) of the Securities Act, which prohibits fraud in the 'offer or sale' of a security, are essentially the same as the elements of claims under § 10(b) and Rule 10b-5," *id.*, except that, "though § 17(a)(1) requires proof of scienter, 17(a)(2) and (3) require only proof of negligence." *SEC v. Johnson*, No. 03-cv-177 (JFK), 2006 WL 2053379, at *4 (S.D.N.Y. July 24, 2006). DeFrancesco contends that the Complaint fails to allege the first element, material misrepresentations or omissions or use of a fraudulent device. (Def. Br. at 14-25.) As set forth below, the Complaint adequately alleges that DeFrancesco made material misrepresentations and omissions and employed a fraudulent device by engaging in a pump-and-dump scheme.

## I.    The Complaint Adequately Alleges Material Misstatements and Omissions.

DeFrancesco first argues that the alleged misstatements and omissions in Cool's SEC filings are either "non-actionable puffery" or expressions of "legally protected optimism about the business." (Def. Br. at 2.) He contends that the filings "thoroughly (and accurately) disclosed Cool's financial condition" and that, therefore, a reasonable investor would not be misled. (*Id.*)

Under the applicable case law, the misrepresentations and omissions in Cool's filings were neither puffery nor non-actionable opinion statements. On the contrary, Cool's false and misleading statements deceived the public about its most important business relationship, a relationship upon which Cool's future entirely depended. As Cool and DeFrancesco knew—but investors did not—in January 2018, following years of poor performance, unpaid invoices, and inventory backlog by Cool, Apple imposed a halt on any further expansion by Cool, and this halt remained in effect throughout 2018. (¶¶ 55-58.) By failing to disclose the halt and the reasons that led to it, Cool defrauded the investing public.

### A.     The Misrepresentations and Omissions Were Not Puffery.

DeFrancesco's argument is contrary to well-settled law in this Circuit that "[s]tatements are not puffery if they contradict facts that are known to a defendant." *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 537 (S.D.N.Y. 2016).

Cool's Forms 10-Q, filed in May and August 2018, stated that Cool's "goal" was to expand to "200 locations" in three years and "become one of Apple's largest retail partners," and that it expected this to happen through a combination of "organic expansion" and "external acquisitions." At the time of these disclosures, Cool and DeFrancesco knew facts that contradicted these purported goals and expectations: specifically, that Apple, its primary business partner, had imposed a halt on any further expansion due to Cool's inventory deficiencies, poor performance and unpaid invoices. Cool and DeFrancesco also knew that the risk factors that Cool warned investors about—that the company could fail to adhere to Apple's "very strict performance standards and guidelines"—had actually come to fruition.

Cool's knowledge of these undisclosed facts contradicted its public statements and takes them out of the realm of puffery. *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 190–91 (S.D.N.Y. 2010) ("'[M]isrepresentations of existing facts' that would have misled a

11

reasonable investor are actionable.") (internal citations omitted); *see also Novak v. Kasaks*, 216 F. 3d 300, 315 (2d. Cir. 2000) (Defendants' statements that "the inventory situation was 'in good shape' or 'under control'" while they allegedly knew that the contrary was true . . . were plainly false and misleading."); Section II, *infra* (citing cases).

### B.   The Misrepresentations and Omissions Are Actionable, Even If They Are Opinions.

DeFrancesco incorrectly argues that Cool's relevant statements were nonactionable "statements of opinion" because they concerned "future performance or growth" and that Cool was under no obligation to disclose all facts "cutting the other way." (Def. Br. at 9.) He relies on *Omnicare, Inc. v. Laborer Dist. Council Constr. Ind. Pension Fund*, which held that a statement of opinion may be actionable under any one of three circumstances: (1) where the speaker does not honestly hold the stated opinion; (2) where the opinion includes an "embedded statement of fact" that the speaker knows to be false; or (3) where the opinion omits to state facts necessary to make its statement of opinion not misleading. 575 U.S. 175, 187-93 (2015); *see also Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020); *SEC v. Thompson*, 238 F. Supp. 3d 575, 601 (S.D.N.Y. 2017). DeFrancesco fails to address the three *Omnicare* prongs and, instead, offers a series of factual interpretations that are inappropriate on a motion to dismiss. For example, DeFrancesco argues that Cool's board had "ample basis to believe that these circumstances would resolve," that Cool's fundraising and debt-to-equity was improving, and that an "infusion of liquidity" was expected. (Def. Br. at 10-11.) None of these factual assertions, however, fairly describe the Complaint's allegations or the plausible inferences that can be drawn from them. For the reasons below, Cool's disclosures are actionable under *Omnicare*.

*First*, the Complaint does not concede that the misrepresentations were genuinely or reasonably "Cool's goals and expectations," as DeFrancesco claims. (Def. Br. at 8.) On the

contrary, satisfying the first *Omnicare* prong, the Complaint alleges in detail the reasons why neither Cool nor DeFrancesco honestly could have held any such expectations. Indeed, the most plausible inference from the Complaint's allegations is that Cool and DeFrancesco did **not** believe that Cool could expand from 16 to 200 locations because, as DeFrancesco knew, Apple had prohibited the company from expanding to other locations. At most, this is a disputed inference for a jury to decide; the Complaint adequately alleges the first *Omnicar*e prong.

*Second*, under the third *Omnicare* prong, "plaintiffs can allege that a statement of opinion, without providing critical context, implied facts that can be proven false" to state a claim. *Abramson*, 965 F. 3d at 175. When a reasonable investor would "understand [the] opinion statement to convey facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view," *Omnicare*, 575 U.S. at 188, the third prong is satisfied. *Omnicare* provides an example: it would be misleading for an issuer to state, "We believe our conduct is lawful," when the issuer had not consulted a lawyer. *Id.*; *see also id.* at 191 ("[T]he leading treatise in the area explains that 'it has been recognized very often that the expression of an opinion may carry with it an implied assertion, not only that the speaker knows no facts which would preclude such an opinion, but that he does know facts which justify it.'") (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Torts § 109, at 760). This inquiry "always depends on context," and the Supreme Court recognized that registration statements are "formal documents," and a reasonable investor does not "expect opinions contained in those statements to reflect baseless, off-the-cuff judgments, of the kind that an individual might communicate in daily life." *Omnicare*, 575 U.S. at 190. *Omnicare* also noted "that a reasonable investor generally considers the specificity of an opinion statement in making inferences about its basis," and "would think that a more detailed investigation lay behind" a

specific number than a general description of a situation. *Id.* at 190 n.8.

The Complaint adequately alleges facts that satisfy this third *Omnicare* prong. The Complaint pleads that Cool's statement that its "goal" and expectation were to expand to "200 locations" was inconsistent with the facts Cool had, including that Apple had imposed a "halt" on any further expansion because of Cool's financial and operational problems. *See SEC v. Sequential Brands Grp., Inc.*, No. 20-cv-10471-JPO, 2021 WL 4482215, at *7 (S.D.N.Y. Sept. 30, 2021) (denying motion to dismiss where company's "determination not to recognize a goodwill impairment did not fairly align with the information it had in its possession at the time"). The relevant alleged statement included a specific number—200 stores—rather than a general statement about a goal of growth, and the statement was made in SEC filings. Thus, investors reasonably would have believed that the statement was based on a factual assessment, while Cool knew facts rendering the statement false or misleading.[2]

DeFrancesco makes a number of other arguments as to why the relevant statements are non-actionable opinions. None of these arguments has any merit.

DeFrancesco asserts, with respect to the third *Omnicare* prong, that Cool's dispute with Apple was "nothing more than standard day-to-day troubleshooting, principally on late payments and corresponding inventory shortages." (Def. Br. at 10.) But his only citation for this factual assertion is several emails that indicate the opposite. For example, in the August 22, 2018 email, DeFrancesco omitted Apple's global unresolved concerns: "We want One Click to meet its objectives and be more relevant"; "you have not yet managed to achieve the desired performance

---

[2] Even if the opinion statements each individually contained a kernel of truth, taken together, their omissions created a false and misleading impression to a reasonable investor about the basis for Cool's opinion concerning its expansion to 200 locations. "[U]ntrue assertions, ambiguous statements, and half-truths can render a statement misleading." *SEC v. StratoComm Corp.*, 652 Fed. App'x 35, 37 (2d Cir. 2016) (citation omitted).

in authorized [stores]"; and "[f]or us to re-authorize an expansion with One-Click we need [compliance with program guidelines] to start happening in a consistent way for a reasonable time and in all stores that already operate in Latin America." (Def. Ex. 2.) And in the September 27, 2018 email that DeFrancesco selectively cites, he excludes Apple's statement, "We hereby confirm that Apple will not approve Reseller's requests for further expansion of its Authorized Locations in view of the poor business metrics of the existing One Click stores evidenced during the last 24 months." (Def. Ex. 3.) DeFrancesco minimizes the seriousness of the expansion halt as mere "interim concerns" that are "irrelevant" to Cool's "optimistic statements." (Def. Br. at 11.) This position, however, misstates the law, as described above, and, in any event, raises factual positions that are inappropriate for resolution on a motion to dismiss.[3]

DeFrancesco also challenges the materiality of Cool's false statements, arguing that the "context of Cool's statements about its 'goal' to expand further undermines any notion that they were misleading." (Def. Br. at 12.) However, because materiality is a mixed question of fact and law, materiality determinations are rarely appropriate on a motion to dismiss or indeed before trial. *See, e.g., Altimeo Asset Mgt. v. Qihoo 360 Tech. Co. Ltd.*, 19 F.4th 145, 150 (2d Cir. 2021). Only if misstatements or omissions are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance" may immateriality justify dismissal. *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000). DeFrancesco falls far

---

[3] DeFrancesco relies on *Tongue v. Sanofi* (Def. Br. at 17-18), where the Second Circuit, applying *Omnicare*, found that a pharmaceutical company's failure to disclose the Food and Drug Administration's ("FDA") interim concerns about the company's testing methodology, which may have "potentially undermined [the company's] optimistic projections," did not render the projections misleading. 816 F.3d 199, 212 (2d Cir. 2016). The court found that the company need not have disclosed the FDA's concerns simply because it "tended to cut against their projections" and, in any event, that FDA's concerns were publicly known. *Id*. Here, in contrast, Apple did not merely express concerns about Cool's poor performance; it took action by halting Cool's expansion, a fact that was not disclosed to the public.

short of demonstrating that this standard is met based on the "other disclosures" made.

Specifically, Apple had halted Cool's expansion because of a variety of failures, including operational and financial failures. Cool's negative disclosures about "its balance sheets, P&L statement, and statements of cash flows" were insufficient to inform investors that these figures were among several obstacles making Cool's professed goal and expectation of growing from 16 to 200 stores in three years infeasible. Cool concealed that Apple had halted Cool's expansion and the metrics Cool would have to achieve for the halt to be lifted. Therefore, investors did not know the impact these financial figures would have on Cool's purported goal and expectation. As the Supreme Court has pointed out, "a misleading statement will not [] lose its deceptive edge simply by joinder with others that are true," unless the true statements "discredit the other one so obviously that the risk of real deception drops to nil." *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991). If only a "financial analyst" could "spot the tension" between the disclosed and undisclosed facts, "whatever [was] misleading [would] remain materially so." *Id.* The alleged statements are therefore misleading in context.

Next, DeFrancesco describes the halt as a mere "pause[]" in Cool's expansion plans and characterizes the extensive allegations of the halt and its aftermath as "irrelevant" because "the Complaint does not allege that Apple would never approve Cool to expand [sic]." (Def. Br. at 11.) But this is merely spin. Apple did not need to state it would "never approve" an expansion by Cool; instead, it halted any further expansion until Cool met specific metrics. The halt was not an immaterial hiccup or temporary bump in the road: it meant that, although Cool was operating 16 stores, it could not open a 17th store—let alone a 200th store—unless, as Cool itself acknowledged, it satisfied Apple's "very strict performance standards and guidelines." (¶ 97.) And in June and July 2018, Cool continued to fall short of Apple's standards, Apple rebuffed

DeFrancesco's plea to reverse the halt due to Cool's poor performance, and Apple again made clear in late August 2018 that a re-authorization was not possible.[4] (¶¶ 86-95.)

Finally, DeFrancesco contends the Complaint "selectively quotes" from certain documents purportedly supporting his view that Cool's economic prospects were improving such that "further expansion" was possible. (Def. Br. at 10-11.) In fact, the emails DeFrancesco cites show that Apple was firm that it would not change its halt on expansion absent significant improvements and that DeFrancesco knew this at the time. (*See* Def. Ex. 2 (9/27/18 email confirming "Apple will not approve [Cool's] request for further expansion . . . in view of the poor business metrics"); Def. Ex. 7 (5/5/18 "urgent" email from Apple demanding payment "of the $518K that is past due").)

## II.     Cool's Risk Disclosures Fraudulently Described Harms That Had Already Occurred as Mere Possibilities.

The Complaint alleges that Cool misleadingly disclosed only its "risk" of falling short of Apple's performance standards when, in fact, Cool already had fallen short of those standards and, in response, Apple already had halted Cool's ability to expand. (¶¶ 96-101.) DeFrancesco's argument—that this allegation does not adequately state a claim of material misrepresentation or omission—is contrary to Second Circuit law, which requires a company speaking on a topic to tell the whole truth, which Cool did not do.

"Even when there is no existing independent duty to disclose information, once a

---

[4] In support of his argument, DeFrancesco cites *Steinberg v. PRT Grp.*, 88 F. Supp. 2d 294 (S.D.N.Y. 2000), which involved facts not present here. In *Steinberg*, a technology firm disclosed that it expected to receive revenue from Y2K business, which the plaintiff argued was misleading because the company had failed to obtain such business from certain existing clients. *Id.* at 308. The court disagreed because the fact that the company had not obtained Y2K business from certain existing clients did not mean it "would obtain **no** future Y2K business whatsoever." *Id.* at 311 (emphasis in original). Here, in contrast, the Complaint alleges that Cool cannot point to other clients from which it could improve its prospects, as the defendant in *Steinberg* did. Cool's business primarily depended on a single client, which had halted Cool's expansion.

company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014). "[W]hen an offering participant makes a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate." *Id.* at 250-51 (quoting *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010)); *see also Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 637 (S.D.N.Y. 2012) ("Although 'Rule 10b–5 imposes no duty to disclose all material, nonpublic information, once a party chooses to speak, it has a duty to be both accurate and complete.'") (quoting *Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.*, 753 F. Supp. 2d 166, 180 (S.D.N.Y. 2010)).

For that reason, courts have held:

> **A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability.** One cannot, for example, disclose in a securities offering a business's peculiar risk of fire, the installation of a comprehensive sprinkler system to reduce fire danger, and omit the fact that the system has been found to be inoperable, without misleading investors.

*Meyer*, 761 F.3d at 251 (emphasis added and citations omitted) (reversing order granting Rule 12(b)(6) motion where issuer warned that it pollutes and is subject to Chinese environmental regulations, but failed to disclose that it had already submitted a report to Chinese environmental regulators about existing environmental problems); *see also, e.g., Christine Asia Co. v. Ma*, 718 F. App'x 20, 23 (2d Cir. 2017) (reversing order granting Rule 12(b)(6) motion where Chinese online merchant Alibaba, a public company, disclosed that counterfeit goods were sold on its site and regulatory risk existed, but failed to disclose that Chinese authorities had held a meeting with Alibaba demanding that it stop selling counterfeit goods or face massive fines); *In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) (One may not "warn[] his hiking companion to walk slowly because there might be a ditch ahead when he knows with near

certainty that the Grand Canyon lies one foot away."); *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005) ("[T]o warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.") (citation omitted).

Here, the Complaint alleges that DeFrancesco and Cool did precisely what the Second Circuit has ruled they may not do: they gave a generic warning of a risk while concealing that the risk had already occurred, rendering the disclosure incomplete and misleading. As described above, Cool's SEC filings and registration statements from March 31 to September 10, 2018, predicted a rapid increase of Cool stores in Latin America, the U.S., and Canada (and consequent profitability), with the risk proviso that such growth depended on Apple's approval and Cool's compliance with Apple's performance standards. (¶¶ 97-98.) Cool misleadingly failed to disclose, however, that it already had violated Apple's performance standards; that Apple already had halted Cool's Latin American expansion; that Cool was not licensed to expand into Canada; and that Cool had no plans for U.S. expansion. (¶ 99.) Cool's assertion that Apple's restrictions were merely possible, when those restrictions had already occurred, constituted deceit.

DeFrancesco nevertheless wrongly contends that, "[w]hen assessing risk factors in public filings, the key question is whether the *harm* identified in the risk factor has already occurred, not whether the factual predicate that may bring about the harm has occurred." (Def. Br. at 19.) That is not the law but, even if it were, the Complaint would satisfy that standard.

Contrary to DeFrancesco's argument, the cases cited above, including *Meyer*, *Ma*, and *Van der Moolen*, establish that it is deceitful for a public company to disclose a risk as a possibility if it has come to fruition, regardless of whether the harmful effects already have been felt. For instance, the issuers in *Meyer* and *Ma* had not yet been harmed by Chinese government

measures at the time of the relevant risk disclosures, but the Second Circuit reversed the district court decisions granting motions to dismiss because the contingent nature of the risk disclosures were deceptive given the concrete nature of the relevant factual predicate. *See Meyer*, 761 F.3d at 251; *Ma*, 718 F. App'x at 23. Indeed, *Meyer's* and *Prudential*'s examples of such deceit—warning of fire hazard while failing to disclose a faulty sprinkler or warning of a possible ditch when the Grand Canyon is nearby—dispel DeFrancesco's assertion that companies need not disclose established facts relevant to risks until the harm already has occurred.[5]

Even if DeFrancesco's reading of the law were correct, it still would not require dismissal because, in this case, both the factual predicate **and** the harm had already occurred by the time Cool made the misstatements. Not only had Apple found Cool to be in violation of its standards, it also had blocked Cool from expanding in Latin America before, during, and after the fraudulent risk disclosures at issue. (¶ 99.) Thus, Cool's failures already had jeopardized its strategy and impeded its growth—the precise risks Cool had warned were only contingent possibilities. DeFrancesco's argument, that Cool might one day satisfy Apple's requirements and, thus, that its failure to disclose its current noncompliance was immaterial (Def. Br. at 20), is

---

[5] The cases DeFrancesco cites do not support his position, as they turn on fact-specific inquiries about whether the omissions in those cases actually rendered the alleged misstatements misleading and whether the complaint adequately alleged defendants' knowledge that they did so, unlike in this case. *See Williams v. Globus Med., Inc.*, 869 F.3d 235, 243 (3d Cir. 2017) (issuer's disclosure that loss of distributors could lead to revenue loss did not misleadingly omit that one distributor had been lost, where no loss of revenue had yet occurred, and complaint failed adequately to allege defendant's knowledge that losing distributor would cause sales drop); *Chapman v. Mueller Water Prod., Inc.*, 466 F. Supp. 3d 382, 406 n.6 (S.D.N.Y. 2020) (issuer disclosure that its products may have "quality or other defects" could not reasonably be read as guarantee that no products would have defects, and complaint did not adequately allege that company knew of any such large-scale problems); *Ulbricht v. Ternium S.A.*, No. 18-cv-6801 (PKC), 2020 WL 5517313, at *9 (E.D.N.Y. Sept. 14, 2020) (company that paid bribe to Argentine official, but was not yet investigated for doing so, did not make misleading omission by disclosing risk that company could be affected by instability in Argentine government).

nonsensical and contrary to established law. *See Ganino*, 228 F.3d at 165 ("Materiality is determined in light of the circumstances existing at the time the alleged misstatement occurred.").[6]

## III.   The SEC Does Not Contend That DeFrancesco "Made" the Article Statements.

DeFrancesco argues that he cannot be liable as the "maker" of the misrepresentations in Cool's promotional articles for purposes of Rule 10b-5(b). (Def. Br. at 21-22.) In fact, the SEC does not seek to hold him liable as the maker of these misrepresentations. The SEC's Rule 10b-5(b) claim against him is based only on his misrepresentations in SEC filings. DeFrancesco's argument that he also cannot be liable under Rule 10b-5(a) and (c) and Securities Act Sections 17(a)(1) and (3) for the promotional article misstatements, however, misreads the primary case upon which the argument is based, *SEC v. Rio Tinto*, 41 F.4th 47, 49 (2d. Cir. 2022), as addressed below.

## IV.   The Complaint Adequately Alleges Claims for "Scheme Liability."

DeFrancesco seeks dismissal of the SEC's "scheme liability" claims. He argues that the Complaint does not adequately allege conduct by him "*beyond* misstatements and omissions," as required by the Second Circuit's decision in *Rio Tinto*, 41 F.4th at 49. (Def. Br. at 17-19 (quoting *Rio Tinto*).) Contrary to his argument, the Complaint is replete with allegations of such additional conduct by DeFrancesco.

---

[6] DeFrancesco claims that Cool's 2018 Form 10-K shows that Cool "was expanding per its strategy." (Def. Br. at 20.) In addition to being insufficient to warrant dismissal, this claim is almost as deceptive as Cool's risk disclosures. In fact, Cool did not repair its relationship with Apple in 2018, and the only stores it added were those related to a 2017 acquisition that was held up for accounting reasons. (*Compare* Def. Ex. 6 at 20 (cited by DeFrancesco for the increase in stores) *with* Def. Ex. 4 at 19 (explaining the 2017 acquisition and delay).) In any event, the Complaint alleges the "who, what, when, where, and how" of Cool's deficient risk disclosures. If DeFrancesco has a different view of the facts, a motion to dismiss is not the place to present it.

Under *Rio Tinto*, the SEC must allege "something extra"—beyond false statements or omissions—to state a claim for scheme liability, although the Second Circuit expressly refrained from defining precisely what that "something extra" must be. 41 F.4th at 54. Courts applying *Rio Tinto* have established that a "wide range" of additional conduct suffices to state a claim for scheme liability. *SEC v. Stubos*, No. 22-cv-04674 (LJL), 2022 WL 6776741, at *15 (S.D.N.Y. Oct. 11, 2022). Prior to *Rio Tinto*, courts in this Circuit required that such additional conduct be "inherently deceptive." *In re Turquoise Hill Res. Ltd. Sec. Litig.*, No. 20-cv-08585 (LJL), 2022 WL 4085677, at *58 (S.D.N.Y. Sept. 2, 2022). Even if that requirement still stands, as DeFrancesco contends, the Complaint more than satisfies it.[7]

The Complaint details DeFrancesco's fraudulent "pump-and-dump" scheme, which involved both his false statements and his additional deceptive conduct. (¶¶ 102-72, 191-224.) Pump-and-dump schemes are a classic example of conduct that leads to scheme liability. *See*, *e.g.*, *Stubos*, 2022 WL 6776741, at *15 (denying motion to dismiss scheme liability claim where SEC alleged that defendant engaged in pump-and-dump scheme); *SEC v. Sayid*, No. 17-cv-2630 (JFK), 2018 WL 357320, at *7 (S.D.N.Y. Jan. 10, 2018) (same); *SEC v. Sugarman*, No. 19-cv-5998, 2020 WL 5819848, at *11 (S.D.N.Y. Sept. 30, 2020) (same). Indeed, the Complaint details at least four categories of inherently deceptive conduct by DeFrancesco in addition to his false statements—each of which was integral to his pump-and-dump scheme:

- DeFrancesco covertly amassed 32% of Cool's outstanding stock through the Nominee Entities—which he secretly controlled and failed to disclose, in violation of Exchange Act Sections 13(d) and 16(a) and Rules 13d-1 and 16a-3 thereunder (¶¶103-26, 214-18, 222-24);

---

[7] The *Turquoise Hill* decision references pre-*Rio Tinto* cases requiring additional conduct that was "inherently deceptive." 2022 WL 4085677, at *58. *Turquoise Hill*, however, does not directly address whether that requirement remains after *Rio Tinto*. In any event, because the Complaint alleges additional, "inherently deceptive" conduct by DeFrancesco, the Court need not decide here whether that requirement still applies to scheme liability claims in this Circuit.

- to further conceal his scheme, DeFrancesco lied to Cool's auditors about his control of one of the Nominee Entities (¶¶ 114-19, 191-96);

- to pump up Cool's stock price so that he could profitably sell his Cool stock, DeFrancesco, with Diaz and Rezk, orchestrated a fraudulent promotional campaign, including by providing and approving false and misleading content for, and secretly funding, several articles that materially misrepresented Cool's business operations and prospects (¶¶ 127-62); and

- to further conceal his scheme, DeFrancesco arranged for the unregistered (undisclosed) sales of over one million shares of the Nominee Entities' Cool stock, in violation of Securities Act Section 5 (¶¶ 167-72, 205-13).

Federal courts have held that each of these types of acts constitutes inherently deceptive conduct sufficient to allege scheme liability. *See West Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 845 F.3d 384, 393 (8th Cir. 2016) (holding that public company's payments to medical journal to make false public statements beneficial to the company constituted sufficient additional conduct to support scheme liability claim and explaining that "the act of paying physicians to induce their complicity is the allegation at the heart of the scheme liability claim"); *Stubos*, 2022 WL 6776741, at *15 (SEC stated scheme liability "pump-and-dump" claim by alleging as "something extra" that Defendant, *inter alia*, used "various nominee companies to conceal his majority ownership of" stock at issue; "failed to register his sales of these shares with the SEC as required under the securities laws"; and "secretly sold his stock without making the disclosures required by federal law and while pumping up the price of the stock through misleading disclosures made by stock promoters paid with money from him that was funneled through intermediary nominees."); *SEC v. Sandoval*, No. 17-cv-20301, 2018 WL 11353292, at *8 (S.D. Fla. Apr. 11, 2018) (SEC stated scheme liability claim against company CEO who made "deceptive contributions to an overall fraudulent scheme beyond mere misrepresentations and omissions" by "directing subordinates to participate in covering up [an]

inventory theft, by destroying documents and lying to auditors."); *SEC v. ITT Educ. Servs., Inc.*, 303 F. Supp. 3d 746, 765-66 (S.D. Ind. 2018) (evidence that defendants misled auditors—in addition to alleged misstatements and omissions—was sufficient to defeat defendants' motion for summary judgment on SEC scheme liability claim).

DeFrancesco argues only that the Complaint does not sufficiently allege one sub-category of his deceptive conduct—the Cool promotional articles that he orchestrated. (Def. Br. at 18-19.) DeFrancesco thus ignores the Complaint's other allegations of his deceptive conduct (described above), each of which is sufficient to support the SEC's scheme liability claim.

In any event, contrary to his argument, the Complaint adequately details how DeFrancesco knew that the articles were false, how he paid for them, and how he concealed that fact. (¶¶ 131-35, 157-62.) Regarding DeFrancesco's knowledge, Cool's own internal revenue estimates contradicted the information contained in the promotional articles (¶¶ 131-35), as did Cool's public filings. (*Compare* ¶ 138 (headline claimed Apple was giving Cool Holdings a "$900 Million Revenue Stream") *with* Def. Ex. 4 at 4 (quarterly revenue of under $10 million).) Furthermore, the Complaint details how DeFrancesco concealed his payments for the articles by funneling them through two of the Nominee Entities. (¶¶ 158-62.)

DeFrancesco's additional argument—that Securities Act Section 17(b) imposed no duty on DeFrancesco to disclose his payment for the articles—is inapt because the Complaint does not charge him with violating Section 17(b). And, critically, the Complaint does not merely allege an omission—rather, it alleges that the articles *affirmatively misrepresented* that *Cool* had paid for them. (¶ 157.) Thus, even though Section 17(b) imposed no independent disclosure duty on DeFrancesco, Exchange Act Section 10(b) and Securities Act Section 17(a) prohibited DeFrancesco from *affirmatively misleading* the public by orchestrating promotional articles

falsely stating that Cool had paid for them. *See SEC v. Nutra Pharma Corp.*, 450 F. Supp. 3d 278, 287-88 (E.D.N.Y. 2020) (complaint adequately pled a misleading statement by public company and its chief executive officer, where their press release claimed that an analyst firm had "issued a report that was 'not paid for' and 'unbiased,'" after the company had paid for the promotion and the CEO had approved the report, even though Section 17(b) created no independent duty).[8]

DeFrancesco's final argument—that "[n]o investor could have been misled" by the promotional articles' payment misrepresentation (Def. Br. at 19)—should fail for at least two reasons. *First*, as explained above, this misrepresentation was only one of many DeFrancesco deceptions comprising his broader pump-and-dump scheme. If he had disclosed his accumulation of shares before the promotion (as he was required to) and then disclosed that he had paid for the promotion, it would have been more obvious to a reasonable investor that a pump-and-dump was afoot. DeFrancesco's deceptive acts should not be viewed in isolation from each other, but rather together as part of one scheme. *Second*, DeFrancesco raises, at best, a fact dispute regarding the materiality of this particular false statement, which is inappropriate for resolution at this juncture, as noted above in Section I.B (citing cases).

The Court should therefore deny DeFrancesco's motion to dismiss the SEC's scheme liability claims against him.

## CONCLUSION

For the foregoing reasons, the Court should deny DeFrancesco's Motion in its entirety.

---

[8] The cases DeFrancesco cites are inapposite, as they concern solely defendants' alleged failure to disclose an issuer's payments to promoters—as opposed to defendants' affirmative misrepresentations about the source of such payments. *See In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257, 1272-73 (11th Cir. 2016); *Cortina v. Anavex Life Sci. Corp.*, No. 15-cv-10162 (JMF), 2016 WL 7480415, at *4-5 (S.D.N.Y. Dec. 29, 2016).

Dated:  April 19, 2023
          New York, New York

Respectfully submitted

By:  /s/ Jason D. Schall
David P. Stoelting
Jason D. Schall
Katherine S. Bromberg
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004-2616
(212) 336-0174 (Stoelting)
Email:  StoeltingD@sec.gov

*Attorneys for Plaintiff Securities and Exchange Commission*